**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0379n.06
Filed: May 30, 2006

**Case No. 04-6383**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| MICKEY BERRY, aka MITCHELL | ) | DISTRICT OF TENNESSEE |
| BERRY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

_____

BEFORE: SILER, BATCHELDER, and GIBBONS, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Mickey Berry ("Berry") appeals his conviction and sentence on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court found that Berry was an armed career criminal as defined by the United States Sentencing Guidelines Manual (hereinafter "sentencing guidelines" or "guidelines") and imposed a sentence of 216 months in prison and five years of supervised release. On appeal, Berry asserts that the district court erred in denying his motion to suppress the weapons found in his home, in calculating his sentence, and in treating the sentencing guidelines as mandatory. Although we find that the district court properly denied Berry's motion to suppress and did not err in calculating the guidelines sentence, we must remand the case for re-sentencing under *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005).

**I. Factual and Procedural History**

On August 27, 2003, FBI Special Agent Paul Healy ("Healy") and Tennessee Highway Patrol Investigator Terry Thomas ("Thomas") followed Sequatchie County Deputy Keith Herron ("Herron") to Berry's residence in rural southeastern Tennessee. The officers intended to talk to Berry, whose felony record was known to them, about his knowledge of a suspect who had been arrested earlier that day. Herron was in a marked county sheriff's vehicle, and Healy and Thomas were in an unmarked vehicle. As the vehicles approached, Healy observed two white males standing in front of the residence. Upon seeing the police cars, one of the men, who had long hair pulled into a pony tail, ran inside. Healy and Thomas immediately drove to the rear of the residence and, as they exited their vehicle, Berry came out of the residence and began to run from them.

Healy and Thomas ordered Berry to stop, identified themselves to him, and informed him that someone had run into the residence as they had approached. They obtained Berry's acknowledgment that he was the owner of the residence and his permission to enter the home in order to search for the person. When Healy and Thomas entered the residence, they encountered two men in the living room, neither of whom was wearing his hair in a pony tail. Continuing his search, Thomas entered a back bedroom where he encountered Melissa Stewart ("Stewart"), and observed a .38 caliber revolver in plain view on a night stand. Also in the bedroom was a locked closet, large enough for a person to hide in. Thomas asked Stewart if there was anyone in the closet and Stewart indicated either that there was not or that she did not know, and that Berry had the key. The accounts differ as to whether Berry himself unlocked the closet door or gave Thomas the key to the door, but it is undisputed that Berry provided access to the closet. Inside the closet, Thomas observed guns and pistol cases in plain view; he confiscated the weapons for the safety of the officers.

2

As it happened, the man with the pony tail, who turned out to be Berry's son Brian, had come out of the residence almost immediately after going in. While the search for him was proceeding – Officers Thomas and Healy having apparently missed Brian's exit because they had been behind the residence stopping Berry's escape and obtaining permission to conduct the search – Brian was in front of the residence, explaining to Officer Herron that he had gone inside to warn his father that the police had arrived. According to Brian, the elder Berry had a young woman in his bedroom and Brian wanted to warn his father "out of respect" because they "might be having sex or something."

Having found guns in the residence, Healy and Thomas asked Berry to consent to a thorough search of the premises. They advised him that they did not have an arrest or search warrant, and asked him to sign a consent to search his residence, vehicles, and outbuildings. Berry refused to sign the form, but orally consented, telling Healy and Thomas that they could search the residence because they would be able to get a warrant anyway. Healy emphasized that Berry could decline to give consent, but Berry again said that the officers could search the residence, and that he would deny owning anything they might find in the residence. Healy and Thomas proceeded to search the residence, where they found and seized a loaded MAK-90 assault rifle, a black case with a set of digital scales, and several baggies of marijuana.

Berry was indicted by a federal grand jury on three counts: being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) ("Count One"); possession of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) ("Count Two"); and possession of firearms in furtherance of the drug trafficking crime charged in Count Two, in violation of 18 U.S.C. § 924(c)(1)(A)(I) ("Count Three"). He pled not guilty and filed a motion to suppress the evidence seized. At the suppression hearing before the magistrate judge, Berry testified

3

that the .38 caliber revolver found on the night stand belonged to his brother, from whom he had taken it to prevent him from shooting himself accidentally. Berry said that he did not know who owned the firearms found in the closet, or the drugs and paraphernalia, but he admitted he was the only person with the keys to the closet. Thomas and Healy testified to the facts and the circumstances surrounding the search, and the government introduced the consent form that was signed by both officers and had the words "verbal but would not sign" written on its face. The government also presented the testimony of Stewart and Carl Redden, one of the men who had been inside the residence when it was initially searched; that testimony was consistent with the officers' testimony.

The magistrate judge recommended that the motion to suppress be denied. Berry filed objections to the report and recommendation, but, finding that the objections were not specific but were mere conclusions, the district court reviewed the report and recommendation as if no objections had been filed, and denied the motion. Berry proceeded to trial on all three counts, and the jury found him guilty only on Count One, acquitting him on Counts Two and Three.

The pre-sentence investigation report ("PSR") calculated Berry's total offense level under Chapter 2 of the sentencing guidelines at 32, and his criminal history category at II. *See* U.S.S.G. § 2K2.1. However, it also determined that a Chapter 4 enhancement should apply because Berry had four prior felony controlled-substances convictions and one prior violent crime conviction for offenses committed on occasions separate and distinct from one another. It therefore found that he was an armed career criminal within the meaning of the guidelines, which resulted in a total offense level of 34 and a criminal history category of VI, *see* U.S.S.G. § 4B1.4, and a guideline range of 262 to 327 months, with a statutory minimum of 180 months. *See* 18 U.S.C. § 924(e)(1).

4

At sentencing, Berry objected to the PSR's recommendation that his base offense level be set at 34. He argued that the record did not support the finding that he had possessed the weapons in connection with a controlled substances offense, and, therefore, he was entitled to a base offense level of 33. The district court gave Berry "the benefit of the doubt" on the question and set the total offense level at 33. With a criminal history category of VI, the guideline range was 235-293 months' incarceration. Following our instructions in *United States v. Koch*, 383 F.3d 436 (6th Cir. 2004), the court treated the guidelines as mandatory and sentenced Berry to 216 months in prison, to be followed by 5 years of supervised release. Berry timely appealed.

## II. Motion to Suppress

### A. Standard of Review

We review de novo the district court's conclusions of law with respect to a motion to suppress evidence, and we review for clear error the court's factual findings, viewing the evidence in the light "most likely to support the district court's decision." *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996) (internal citations and quotations omitted). "A factual finding is clearly erroneous if, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Copeland*, 321 F.3d 582, 591 (6th Cir. 2003). Whether the defendant voluntarily consented to the search is a question of fact, and we will overturn the district court's finding only if it is clearly erroneous. *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999).

However, where the motion to suppress has been referred to a magistrate for a report and recommendation and a party has failed to file objections to that report, that party has waived appellate review, *see Thomas v. Arn*, 474 U.S. 140, 145-46 (1985); *United States v. Walters*, 638

5

F.2d 947, 950 (6th Cir. 1981), and we review only for a miscarriage of justice. *See United States v. Real Property Located at 1184 Drycreek Road*, 174 F.3d 720, 725-26 (6th Cir. 1999); *Kent v. Johnson*, 821 F.2d 1220, 1223 (6th Cir. 1987). Noting the lack of specificity of Berry's objections, the district court reviewed the report and recommendation as if Berry had filed no objections, and Berry does not challenge that determination here. *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("a general objection to a magistrate's report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed"). Berry has therefore waived appellate review and we may only review for a miscarriage of justice.

**B. Analysis**

Berry claims that the district court erred in denying the motion to suppress because: (1) the search was "nothing more than [a] classic pretextural [sic] fishing expedition"; (2) there was no authority for a search; and (3) the scope of the search exceeded the given authority. We have reviewed the record and conclude that Berry cannot show error at all, let alone a miscarriage of justice.

(1) Pretextual Search

Berry argues that the officers had no legitimate reason even to ask for his consent to a search of his home, and their motivations for doing so were unrelated to any belief that he had committed a crime. The Supreme Court, however, has made it clear that it is "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers[.]" *Whren v. United States*, 517 U.S. 806, 813 (1996). *See also Brigham City, Utah v. Stuart*, 547 U.S. __, 2006 WL 1374566, *4 (May 22, 2006). A pretext argument is properly raised under the Equal Protection Clause rather than the Fourth Amendment, *id.*, and Berry has alleged nothing of the sort. And even

6

if he had, it is clear from the record that the officers <u>did</u> have a legitimate reason to ask for consent to search. The officers had gone to Berry's residence to talk with him about an individual whom they had just arrested on felon-in-possession charges; Berry was known to them as someone with a felony record; and upon arriving at Berry's home, they saw an individual standing in front of the home who, upon seeing the officers, ran inside the home. Under the circumstances, the officers' determination that they needed to find this individual was not unwarranted.

(2) <u>Authority for the Search</u>

Berry next argues that the officers had no authority to search his home. The record is entirely to the contrary. All testifying parties agreed that Berry gave the officers oral permission to enter his home in order to search for the man with the pony tail, and gave oral – but not written – permission to search the home for contraband after the initial search. Berry's refusal to sign the consent form is of no consequence, as verbal consent to search is sufficient, and Berry's refusal to sign in no way indicated the withdrawal of his earlier verbal consent. In fact, Berry verbally reaffirmed his consent <u>after</u> refusing to sign the form. *Cf. United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006) (after giving verbal consent to search, refusal to sign consent form – in conjunction with other factors – raises a question as to whether consent to search was withdrawn).

To the extent that Berry argues that the consent given was not voluntary, that contention is entirely unsupported by the record. Berry has offered neither testimony nor other evidence demonstrating that he was under any pressure whatsoever, and the testimony in the record shows that Berry was not handcuffed, he was seated in his kitchen, and he was nonchalant about the whole matter. The officers needed only to have a reasonable belief that the defendant's consent was voluntarily given. *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990). These officers clearly had

7

such a belief, and Berry offers no evidence to the contrary. The record supports the finding that the consent given in this case was voluntary. *See United States v. Scott*, 578 F.2d 1186, 1188 (6th Cir. 1978).

(3) Exceeding Scope of Consent

The scope of a consent is that which a reasonable person would have understood from the exchange between the officer and the person granting consent. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The parties here agree that Berry's first consent was limited to a cursory search of the home for the man with the pony tail. Berry does not dispute that the scope of his first consent included the bedroom, nor does he dispute that while in the bedroom, Thomas observed in plain view the loaded pistol on the night stand. *See United States v. Rohrig*, 98 F.3d 1506, 1525 (6th Cir. 1996) (once officers are lawfully within a home, they may seize any contraband they observe in plain view). Neither does Berry dispute that the closet was large enough to hold a person; therefore, the officer legitimately looked there for the man with the pony tail. Finally, Berry does not dispute that he provided access to the closet, and there Thomas observed two more weapons in plain view.

The weapons found in plain view in the residence of a known felon gave the officers probable cause to obtain a search warrant. The officers instead properly asked Berry for his consent to a thorough search of his home. Berry's own statements show that he understood the officers would be able to obtain a search warrant, and he does not dispute that he gave consent for this search, which yielded the additional gun, the drugs, and the drug paraphernalia. Berry has offered no evidence to support his claim that either search exceeded the scope of his consents.

Because the district court did not err at all in denying Berry's motion to suppress the evidence, the denial of the motion cannot constitute a manifest miscarriage of justice.

8

### III. Sentencing

We review a district court's legal conclusions with respect to the application of the sentencing guidelines de novo. *United States v. Campbell*, 309 F.3d 928, 930 (6th Cir. 2002). We accept a district court's findings of fact unless those findings are clearly erroneous. *United States v. Trujillo*, 376 F.3d 593, 615 (6th Cir. 2004).

On appeal, Berry makes three arguments regarding the impropriety of the sentence calculation: (1) he "is simply uncertain how we got to a Level 32"; (2) the sentence was improperly enhanced based upon the district court's tying of the gun offense to another felony offense; and (3) because there was no unanimous jury determination of the number of guns he possessed, the district court improperly enhanced his sentence for possession of additional firearms.

None of these arguments recognizes that the district court sentenced Berry as an armed career criminal under Chapter 4 of the sentencing guidelines, rather than under Chapter 2 based on his specific offense characteristics. While the PSR contained a calculation under Chapter 2, it ultimately recommended that a Chapter 4 enhancement under the Armed Career Criminal Act be applied, which yielded a total offense level of 34 and a criminal history category of VI. During the sentencing hearing, Berry's only objection to the use of the Chapter 4 enhancement was to the base offense level of 34, rather than 33, because he believed that inasmuch as he had been acquitted of the controlled substance count, the one-point enhancement for possessing the weapons in connection with a controlled substance offense was not appropriate. The court gave him "the benefit of the doubt" and used a total offense level of 33 – the lowest offense level possible for an armed career criminal who has not qualified for any other reductions.

In light of Berry's concession at sentencing that he was an armed career criminal, the correctness of the district court's factual findings, and the fact that Berry's arguments relate to the Chapter 2 calculations that never had an effect on his sentence, we conclude that Berry's guideline sentence was properly calculated. However, although the court made no factual findings by a preponderance of the evidence that increased Berry's sentence beyond the statutory maximum – and therefore did not violate Berry's Sixth Amendment rights – the government concedes that the case should be remanded for re-sentencing because the district court treated the sentencing guidelines as mandatory. *See Barnett*, 398 F.3d at 525-30.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of conviction but **REMAND** the case to the district court for re-sentencing.